# United States District Court
## Western District of Virginia
### Harrisonburg Division

|  |  |  |
|---|---|---|
| **NANCY MAY,** | ) | Civil No.: 5:12cv00083 |
| *Plaintiff,* | ) | |
| v. | ) | **REPORT AND** |
|  | ) | **RECOMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| Commissioner of Social Security, | ) | |
|  | ) | By: Hon. James G. Welsh |
| *Defendant,* | ) | U. S. Magistrate Judge |

This is the third civil action instituted in this court by the plaintiff, Nancy May, challenging separate final administrative determinations of the Commissioner of the Social Security Administration ("the agency") denying her claims of entitlement of disability insurance benefits ("DIB") and for Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, as amended ("the Act"), 42 U.S.C. §§ 416 and 423, and 42 U.S.C. §§ 1381 *et sec.*, respectively. Jurisdiction of the court is pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

## I.  Background

Following adverse agency and administrative law judge ("ALJ") determinations of her initial DIB and SSI applications,[1] the plaintiff sought court review of the Commissioner's final determination dated July 28, 2006. This effort was unsuccessful and summary judgment was

---
[1] In her July 29, 2004 initial filings the plaintiff alleged a disability beginning June 8, 2004 due to "fibromyalgia and chronic fatigue syndrome." *May v. Astrue*, 2008 U.S. Dist LEXIS 14204, *5 (WDVa, February 26, 2008).The ALJ's written decision denying this claim is dated July 28, 2006. (R.100-111)

ultimately granted in the Commissioner's favor on March 17, 2008. *May v. Astrue*, 2008 U.S. Dist. LEXIS 121128 (WDVa, Mar. 17, 2008). Following similarly adverse agency and ALJ determinations of her second DIB and SSI applications, [2] the plaintiff again sought court review of the Commissioner's final determination dated July 23, 2008. This effort was also unsuccessful and summary judgment was ultimately granted in the Commissioner's favor on June 14, 2011. [3]

In her current application, the plaintiff for a third time seeks a period of DIB. Therein, she alleges a July 24, 2008 disability onset date [4] due to "[f]ibromyalgia and chronic fatigue syndrome, depression, manic depression anxiety disorder, stress, and chronic neck and back pain." (R. 19,239,244).This application was also denied at all levels of the administrative process, including by a 29-page written decision dated October 29, 2010 in which the ALJ concluded the plaintiff, through her date last insured, [5] retained the functional ability to perform her past relevant work as a fork lift driver. (R. 46-47) The Appeals Council subsequently denied the plaintiff's request for review of this hearing decision (R. 1-3,14-15), and the ALJ's decision now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.

---

[2] In her second filings the plaintiff again alleged a disability beginning June 8, 2004 due to "fibromyalgia and chronic fatigue, depression and [an] anxiety disorder." *May v. Astrue*, 2011 U.S. Dist LEXIS 155210, *2 (WDVa, May 24, 2011). Based on the *res jucicata* effect of the finality of the prior adverse adjudication, the second evaluation and adverse determination "covered the period of time" from 07/29/2006 (one day after the date of the first ALJ decision) and 07/23/2008 (the date of the adverse ALJ action on the plaintiff's second application. (*See* R. 137-149).

[3] *May v. Astrue*, 2011 U.S. Dist. LEXIS 62520 (WDVa. June 14, 2011).

[4] This alleged onset date is one day after the date of the ALJ's decision on the plaintiff's second applications. Thus, the period of time relevant in the instant case is from July 24, 2008 (one day after the date of the second ALJ decision) and December 31, 2009 (her date last insured for DIB). *May v. Astrue*, 2011 U.S. Dist. LEXIS 55210 (WDVa. May 24, 2011). (*See* R. 19, 228)

[5] *See* preceding footnote.

2

Along with his Answer (Docket #8) to the plaintiff's Complaint (Docket #3), the Commissioner has filed a certified copy of the Administrative Record ("R.") (Docket #11), which includes the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision. By standing order this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Without objection and with leave of court, the plaintiff has filed transcribed copies of certain handwritten pages of office notes [6] of Dr. Lawrence Connell (Valley Behavioral Health) variously dated between May 1, 2008 and July 20, 2010. (Docket #16, pp 4-11).Both parties have moved for summary judgment; each has filed a supporting memorandum of points and authorities, and by telephone conference the views of counsel were heard on May 2, 2013. (Docket #24).

## II.   Summary Recommendation

Based on a thorough review of the administrative record and for the reasons herein set forth, it is **RECOMMENDED** that the plaintiff's motion for summary judgment be **DENIED**, the Commissioner's motion for summary judgment be **GRANTED**, an appropriate final judgment be entered **AFFIRMING** the Commissioner's decision denying benefits, and this matter **DISMISSED** from the court's active docket.

This recommended result is not intended to suggest that the plaintiff does not have significant mental and physical health problems, along with pain and attendant functional difficulties. The ALJ, however, specifically assessed each of these health issues and associated

---

[6] The transcribed copies correspond to Record pages 443-444,574-580,587-588 and 663-669.

3

limitations in accordance with his decisional responsibilities. Therefore, the court is constrained to conclude that the Commissioner's final decision is supported by substantial evidence.

### III. Standard of Review

The court's review in this case is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff failed to meet the statutory conditions for entitlement to a period of DIB. "Under the . . . Act, [a reviewing court] must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application of the correct legal standard."*Mastro v. Apfel*, 270 F.3$^d$ 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3$^d$585, 589 (4th Cir. 1996)). This standard of review is more deferential than *de novo*. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro*, 270 F.3$^d$ at 176 (quoting *Laws v. Celebrezze*, 368 F.2$^d$ 640, 642 (4th Cir. 1966)). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id*. (*quoting Craig v. Chater*, 76 F.3$^d$ at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2$^d$ 396, 397 (4th Cir. 1974). The Commissioner's conclusions of law are, however, not subject to the same deferential standard and are subject to plenary review, and reversal may be appropriate when the Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater*, 92 F.3$^d$ 1017, 1019 (10th Cir. 1996); *Island Creek Coal Company v. Compton*, 211 F.3$^d$ 203, 208 (4th Cir. 2000); 42 U.S.C. § 405(g).

**IV.    ALJ Findings**

Addressing the question of whether the plaintiff is disabled within the meaning of the Social Security Act prior to the expiration of her insured status and in accord with the agency's sequential consideration process, the ALJ in the instant case concluded that the plaintiff's *severe*[7] impairments included a fibromyalgia syndrome, depression, cervical and lumbar degenerative disc disease, and obesity.  (R. 19,21-22).  He considered *inter alia* in detail the absence of medical signs or findings in the record that met the medical requirements of any listing,[8] including listings 1.04A, 1.04B and 12.04; he considered the cumulative effects of the plaintiff's impairments, including: her obesity, the mildly limiting nature of her functional limitations, the scope of her daily living activities,[9] her level social functioning,[10] her moderate difficulties with concentration, persistence and pace,[11] and the absence of any extended decompensation episodes; he explained his basis for discounting certain treating source opinions, and he concluded that the plaintiff did not have either any impairment medically equaled or a

---

[7]  Quoting *Brady v. Heckler*, 724 F.2$^d$ 914, 920 (11th Cir. 1984), the Fourth Circuit held in *Evans v. Heckler*, 734 F.2$^d$ 1012, 1014 (4th Cir. 1984), that "an impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."  *See also* 20 C.F.R. §404.1520(c).

[8]  The Listing of Impairments ("the listings") is in Appx. 1 of Subpart P of Part 404 of 20 C.F.R.  It describes for each of the major body systems impairments that the agency considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[9]  Activities of daily living "(*i.e.*, the B1 criterion) include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for one's grooming and hygiene, using telephones and directories, using a post office, *etc.*"   SSA Program Operations Manual System ("POMS") § DI 22511.005.

[10]  Social functioning "(*i.e.*, the B2 criterion) refers to an individual's capacity to interact appropriately and communicate effectively with other individuals."  POMS § DI 22511.005.

[11]  Concentration, persistence or pace "(i.e., the B3 criterion) refers to the ability to sustain focused attention sufficiently long to permit the timely completion of tasks commonly found in work settings."  POMS § DI 22511.005.

combination of impairments that met or medically equaled one of the listings. (R. 22-24,153-171,478,481,488-489).

The ALJ then assessed the functional extent of the plaintiff's medically-related impairments. In doing so, he evaluated the plaintiff's relevant testimony; he took into account the probative value of prior residual functional capacity determinations; he took into account the relevant principles of finality; [12] he determined the decisional weight to give to the opinions of the various treating and non-treating medical sources; he considered the relevant vocational factors (the plaintiff's age, [13] education [14] and vocational background), [15] and he found the plaintiff was not under a disability and was capable of performing her past light [16] exertional job as a fork lift operator through her last insured date. (R. 25-47).

V.   **Pertinent Facts and Analysis**

*Mental Health*

---

[12] Where the rights, issues, and facts involved in successive benefits applications are the same, an ALJ may employ principles of administrative *res judicata* to bar a subsequent claim. *See Peoples v. Richardson*, 455 F.2$^d$ 924, 925 (4th Cir. 1972); 20 C.F.R. § 404.957(c)(1). Therefore, the ALJ in the instant case could properly invoke administrative *res judicata* to bar review of the plaintiff's disability status from July 28, 2006 through July 23, 2008, the date of the second ALJ's decision. *See Albright v. Commissioner*, 174 F.3$^d$ 473, 476 n.4 (4th Cir. 1999) (holding that the ALJ appropriately dismissed the claimant's claim insofar as it related to a previously adjudicated period and that only the unadjudicated period presented a new issue).

[13] The plaintiff was forty years of age at the time her insured status expired. (R. 84, 228). Under the agency's regulations, the plaintiff is classified as a "younger worker." 20 C.F.R. § 416.963(c).

[14] She attended school through the ninth grade and later received a general equivalency diploma ("GED"). (R. 25)

[15] Her relevant work history included jobs as a machine operator, a fork lift operator, and a shipping clerk in an automobile parts manufacturing facility. (R. 25, 85, 244-245).

[16] Light work activity involves lifting no more than twenty (20) pounds with frequent lifting or carrying objects weighing up to ten (10) pounds, and a job in this exertional category generally also requires a good deal of walking or standing or, when it involves sitting most of the time, some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b).

During the decisionally relevant period (July 24, 2008 through December 31, 2009) the plaintiff was seen for mental health care on three occasions. In each instance, she was seen by Dr. Connell, her treating psychiatrist, for only a "15 to 20 minute visit," and on each occasion he found "no change" in her depressive disorder. (R. 464,579,580,588). [17] In his responses to a mental status evaluation form dated May 4, 2009 (R. 574-578) [18] and to a functional capacity questionnaire dated May 18, 2009, Dr. Connell noted the plaintiff's history of mood symptoms "since childhood and her history of counseling and pharmacologic treatment for "recurrent depression." (R.574,595). He reported that the plaintiff's medication regime included Lamictal, Depakote and Prozac. He estimated her IQ to be "average;" he noted that she appeared to have an intact abstracting ability, was "cooperative," alert, appropriately dressed and "[f]ully oriented;" he rated her Global Assessment of Functioning score to be 50 both currently and over the preceding year, [19] and he described her as exhibiting a depressed mood without any suicidal ideations, delusions or hallucinations. (R. 574-576,595-596). Although he acknowledged that he had done no formal psychological testing or assessment of the plaintiff's residual functional capacity, solely on the basis of her subjective complaints of a poor short-term memory, a negative self-image, emotional instability and irritability (as well as chronic pain and fatigue) he

---

[17] Transcribed copies of these medical records dated July 31, 2008 (R. 464), March 23, 2009 (R. 580 and 588) and May 4, 2009 (R. 579 and 587) are included in the court record as Docket #16, pp 4-6.

[18] A transcribed copy of this form is included in the court record as Docket #16, pp 10-11.

[19] The GAF is a numeric scale ranging from zero to one hundred used by mental health clinicians to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health-illness*." Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition ("DSM-IV"), 32 (American Psychiatric Association, 1994).A specific GAF score represents a clinician's judgment of an individual's overall level of functioning; for example a GAF of 41-50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.* no friends, unable to keep a job), and 51-60 indicates "moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *Id*.

opined that "[s]he ha[d] been unable to work" at any time since he first saw her in December 2005." (R. 574,576-578. *See also* R. 595-599).

*Chronic Pain*

At least as early as 2003, when she was then thirty-three years of age, the plaintiff was referred for pain treatment by her primary care physician, and in succeeding years she has continued a pain-treatment regime that has included prescription medication and periodic trigger point injections. (R. 295-296). During the seventeen-month decisionally relevant period in this case, the medical record shows that on a more or less monthly basis she has been treated through Balint Pain Management [20] for her ongoing complaints of moderately severe "back and neck pain," along with attendant stiffness, tenderness, intermittent right upper extremity pain, headaches, and at least on one occasion for "pain all over her body." [21] (R. 401-405, 420, 423-424, 492-502,559-564,619-630,633-650). Her pain-related treatment has included the use of prescription Methadone and Roxicodone for pain, Flexeril for muscle spasms, and periodic nerve blocks to relieve right upper and/or lower extremity pain. (*Id.*) On examination throughout the relevant period the plaintiff's condition has been consistently found by her treating pain management professionals to be stable; she has exhibited no medically significant change either in her medical or her mental status, and she reported no significant change in her pain-related complaints. (*Id.*).

*Physical Health*

In addition to the plaintiff's history of a diffuse pain syndrome, mental health issues and conservative treatment for these conditions, her medical record also documents a long-standing

---

[20] Dr. Robert Audet and FNP Debra Welk.

[21] August 28, 2008 (R. 420)

8

history of cervical disc disease, which required a cervical fusion at C/5-6 in 1999. (R. 337, 351, 402, 421, 423). An MRI in December 2007 also demonstrated a broad-based disc-osteophyte complex at C/5 with some foraminal narrowing, but no evidence of nerve compression. (R. 356, 404). When seen for a neurologic examination in February 2008, Dr. Allen H. Fergus (Winchester Neurological Consultants) found the plaintiff to exhibit a "normal gait," "normal muscle strength," "normal" affect, "normal" thought and cognitive function, an absence of pain on a full range of [cervical spine] motion, and right arm pain that "d[id] not follow any dermatomal pattern." (R. 404). A follow-up EMG and nerve conduction study failed to demonstrate a peripheral neuropathy, and in the opinion of the examining physician they were "[e]ssentially normal."(R. 447-452). A cervical MRI study at Rockingham Memorial Hospital ("RMH") thirteen months later disclosed only a "somewhat" progressed degenerative disc disease at C/3-4 from that shown in a December 2007 MRI. (R. 542).

Based on the plaintiff's August 18, 2008 complaint to Dr. Audet of exquisite low back pain and tenderness, she was referred to imaging services at RMH. (R. 421, 425). The ensuing MRI on August 28 demonstrated "normal" spinal alignment and curvature, no thoracic and lumbar abnormality through L/3-4, but with a large disc protrusion at L/4-5, attendant nerve root impingement at L5 and a "mild" facet abnormality at L5-S1. (R. 356, 425).

*Medical Opinions*

On referral by Dr. Audet, the plaintiff was seen on February 18, 2008 for a consultive neurological examination by Dr. Allan Fergus. (R. 403-405). He found the plaintiff to exhibit no fatigue or fever, no muscle spasms or claudication, no joint pain or numbness, and no muscle atrophy or weakness. Although she reported having neck and a right arm radiculopathy, she had

9

normal muscle bulk, tone and strength in all muscles, and her "cervical spine had no pain and full range of motion with movement." (*Id.*) Pursuant to Dr. Fergus' recommendation an electromyogram and nerve conduction study were done on March 27, 2008. (R. 404, 447-452). These studies demonstrated no clear electrodiagnostic evidence of any upper extremity abnormality or any myopathic process affecting the plaintiff's right upper extremity. (R. 448).

In December 2008 the plaintiff saw Don R. Martin, MD, a radiologist at RMH. (R. 547-549). At that time her medication regimen included a narcotic analgesic (methadone), a narcotic alkaloid (oxycodone), mood disorder medications (Depakote, Prozac and Lamictal), asthma medications (albuterol and Rhinocort), and estrogen (Premarin). (R. 548). On examination Dr. Martin found the plaintiff to be pleasant, articulate, heavyset, in no acute distress, to have a normal metabolic profile, diminished range of cervical spine motion in all planes, and trigger points affecting multiple muscles and connective tissue consistent with a diagnosis of fibromyalgia. (*Id.*). His examination did not identify any of the exclusionary criteria necessary for a chronic fatigue diagnosis. (R. 549). And based on his findings, Dr. Martin recommended that the plaintiff be started on a no- or low-impact aerobic exercise program and that she take a muscle relaxant at bedtime. (*Id.*). When Dr. Martin saw the plaintiff in late February 2009, he reaffirmed his fibromyalgia diagnosis, and he reaffirmed his recommendation that the plaintiff engage in a regular program of gradually escalating aerobic exercise. (R. 545-546).

Based on a review of the medical record in December 2008, a state agency physician concluded the plaintiff suffered from a chronic pain syndrome due to degenerative disc disease and fibromyalgia, and based on the record he classified her exertionally as having a residual

functional capacity to perform light work. [22] (R. 469-474). Based on a separate review of the medical record during the same month, a state agency psychologist concluded that the plaintiff has a depressive disorder, which had required no hospitalization, resulted in no episodes of decompensation, and caused only non-disabling *mild* or *moderate* limitations [23] in the other major areas of mental function. (R. 475-490).

Consistent with these conclusions, approximately five months later, another state agency physician and psychologist reviewed the record, including the pertinent treating source questionnaire responses and opinions, and concluded that the plaintiff's degenerative disc disease, fibromyalgia, and affective disorder were all *severe* impairments; that her mental disorder caused only non-disabling *mild* or *moderate* limitations; that her impairments (both singularly and in combination) were not of listing-level severity; and that the plaintiff retained the functional ability to perform a range of simple routine tasks and work activity at a light exertional level. (R. 39-41, 469-490).

---

[22] To determine the exertional requirements for occupations in the national economy, jobs are classified by the agency as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. §§ 404.1567 and 416.967. Light work requires lifting no more than 20 pounds and frequently carrying 10 pounds, and a good deal of walking or standing, or sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b) and 416.967(b). To be considered capable of performing a full range of light work, the relevant elaboration in Social Security Ruling ("SSR") 83-10 provides that an individual must be able to stand and walk, off and on, for a total of approximately 6 hours of an 8-hour workday.

[23] The agency has identified four broad functional areas in which it rates the degree of functional limitation; these include activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *See* 20 C.F.R. Pt. 404, Subpt. P, Appx.1, § 12.00(C) of the Listings of Impairments. It then rates the degree of functional limitation based on the extent to which the impairment(s) interferes with a person's ability to function independently, appropriately, effectively, and on a sustained basis. When making this rating of the severity of an individual's limitation in the first three of these broad areas of function, the agency uses a five-point scale that ranges from *none*, to *mild*, to *moderate*, to *marked*, to *extreme*, and in rating the degree of limitation in the area of decompensation, the agency uses a four-point scale that ranges from *none* to *four or more*. 20 C.F.R. §§ 404.1520a(c)(4) and 416.920a(c)(4).

The record also contains the mental health-related opinions of Dr. Connell dated May 4, 2009 (R. 574-578), May 18, 2009 (R. 595-599) and September 10, 2010 (R. 657-662), and it contains the physical health-related opinions of Dr. Luis Vigil [24] dated April 29, 2009 (R. 567-573, 688-692) and Dr. Syed Shafqat [25] dated September 15, 2010. (R. 671-675).

Both throughout the decisionally relevant period, and before, Dr. Connell consistently assessed the plaintiff mental health issues to be disabling on the basis of the degree to which she reported her depressive mood, irritability and relationship problems were adversely affected by chronic back pain and fatigue and also on the basis of his attendant reliance on her history (albeit questionable) of hypomanic episodes. (R. 574-578, 595-599, 657-662. *See* R. 24, 62-63, 65-66). Dr. Connell's opinion, however, is supported by no attention/concentration, short term memory, or other psychological testing by a mental health professional. *See e.g., Murray v. Astrue*, 2012 U.S. Dist. LEXIS 127622, *67-68 (NDWVa. July 27, 2012); *Justice v. Astrue*, 2008 U.S. Dist. LEXIS 54923, *32 (WDVa. July 8, 2008).

Despite the absence of any noteworthy medical signs, laboratory findings or even a significant longitudinal treatment history, [26] but also evidently based on the plaintiff's subjective complaints of chronic neck and back pain, fatigue, depression and various attendant limitations.

---

[24] Dr. Vigil is a primary care physician; he did not treat her for her pain problem; she saw him for the first time on April 29, 2009; she saw him irregularly thereafter until he "left the practice," and she thereafter began to see Dr. Shafqat on September 15, 2010, some nine and one-half months after her insured status had expired. (R. 29, 67, 676, 689)

[25] *See* preceding footnote.

[26] Dr. Vigil had seen the plaintiff only twice (09/15/2008 and 04/29/2009) over the course of seven months, when he made his written response to the plaintiff's functional capacity questionnaire on 04/29/2009 (R. 567-571, 688-692, 704-705), and Dr. Shafqat's 09/15/2010 response was based on his "first contact" with the plaintiff, some nine and one-half months after expiration of her insured status (R. 671-675).

Dr. Vigil and Dr. Shafqat also opined that the plaintiff lacked the residual functional ability to perform any kind of work activity on a regular and sustained basis. (R. 567-571, 671-675, 688-692). In contrast, Dr. Audet's office records show that the plaintiff continued to receive regular symptomatic pain treatment throughout the decisionally relevant period, but with any cognizable suggestion of the plaintiff's total disability. (*See* R. 27, 468, 492-502, 559-564, 600-650, 652-655).

*Analysis*

**A.**

Given the Fourth Circuit's holding in *Albright v. Commissioner*, 174 F.3$^d$ 473 (4th Cir. 1999), it is appropriate to note that the Commissioner's prior adverse final determination dated July 23, 2008 is "highly probative" of the plaintiff's continuing functional capacity to perform the exertional and non-exertional requirements of a range of light work. Moreover, on review the objective medical evidence, considered in combination with the prior findings, simply does not indicate that the passage of time has resulted in a substantial change of severity in the plaintiff's medical condition prior to the expiration of her insured status. Otherwise, stated, the objective medical evidence from July 2008 through the end of December 2009 does not show the plaintiff's alleged impairments to have significantly worsened, and the evidence considered for the prior decision does not differ markedly from the evidence considered in her current claim.

**B.**

Equally, there is little support in the evidence for the plaintiff's primary contention that the ALJ erred, by "reject[ing]" the disability endorsement of her psychiatrist (Dr. Connell) and by "finding little merit" in the separate disability endorsements of her primary care physicians (Drs. Vigil and Shafqat). In addition to the fact that these disability opinions speak to an issue

13

reserved for the Commissioner, this argument by the plaintiff ignores the ALJ's outline of each of these treating physician's questionnaire responses in exquisite detail; it ignores his express endorsement of the prior ALJ's relevant mental condition findings; it ignores his finding that Dr. Connell's treatment records demonstrated a "generally routine and conservative treatment" and "minimal mental status examinations," and it ignores his similar finding that the primary care physicians' office notes reflected routine care and "minimal reviews of system and physical examinations." (R. 41-46). By any standard, this is substantial persuasive evidence upon which to base the rejection of the treating source opinions upon which the plaintiff seeks to relay. *See Mastro v. Apfel,* 270 F.3$^d$ 171, 178 (4th Cir. 2001) ("by negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight, [and u]nder such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (internal quotation marks and citations omitted).

## C.

For the same reason the record more than adequately supports a rejection of the plaintiff's related contention that the ALJ erred by relying on opinions of various consultive examiners that are inconsistent with those of her treating physicians. As outlined in detail in his written decision, the results of Dr. Christopher Newell's consultive medical examination and attendant functional assessment in February 2007, Dr. Fergus' consultive neurologic examination and the attendant EMG and nerve conduction findings in February 2008, and Dr. Martin's consultive rheumatologic examination and treatment recommendation in December 2008, provide in combination a solid factual basis upon which to discount the treating source opinions upon which the plaintiff seeks to rely on appeal, and it additionally provides a significant evidentiary basis

14

for the ALJ's residual functional capacity determination. (R. 24, 31-33,36-37). Although they are not treating physicians, their opinions were additionally entitled to significant decisional weight on the basis of their specializations, the supportability of their findings and the consistency of their findings and opinions with the record. *Jarrells v. Barnhart*, 2005 U.S. Dist. LEXIS 7459, *9-10 (WDVa. Apr. 26, 2005). *See* 20 C.F.R. § 404.1527(d)(1, 3-6) and (e).

**D.**

The plaintiff next argues that in combination her "severe impairments potentially could equal the severity of a disability listing." (docket #15 p.15) To the extent she is claiming the ALJ failed properly to discuss and evaluate the combined effect of her impairments at step three of the sequential evaluation process as required by *Walker v. Bowen*, 889 F.2$^d$ 47, 49 (4th Cir. 1989), this claim is totally without merit.

At the hearing plaintiff's counsel specifically represented to the ALJ that the plaintiff was "asserting that [her] condition met or equaled the requirements of section 12.04 of Appendix 1" (R. 22), and in his written decision the ALJ specifically addressed this contention. (R. 22-24). In addition to considering her mental condition alone pursuant listing 12.04, he considered the nature and limiting effects of her back disorder pursuant to listing 1.04A; he considered the nature and limiting effects of her nerve root compression and attendant pain pursuant to listings 1.04B and 1.04C, he evaluated the cumulative effects of her obesity pursuant to Social Security Ruling ("SSR") 02-1p; he took note of the fact that there was no separate listed impairment for fibromyalgia, and he expressly agree[d] with the individual and combined effects listing-analyses of the state agency reviewers. (R. 22-24). Clearly, such a detailed and thorough consideration of

15

the evidence by the ALJ more than adequately satisfied his decisional obligation to consider the combined effects of the plaintiff's limitations.

Alternatively, if this argument by the plaintiff is in effect an effort to convince the court to substitute its judgment for that of the Commissioner, it is equally wanting. It is not for this or any reviewing court to weigh evidence anew or substitute its judgment for that of the Commissioner, provided substantial evidence supports the decision. *Laws v. Celebrezze*, 368 F.2$^d$640, 642 (4th Cir. 1966). Moreover, as the above outline of the evidence patently demonstrates that the ALJ's section 12.04 finding is based on substantial evidence and merits confirmation.

Furthermore, the plaintiff has failed utterly to establish factually that her combination of impairments meets listing 12.04. *Hall v. Harris*, 658 F.2$^d$ 260, 264 (4th Cir. 1981) ("A claimant for disability benefits bears the burden of proving a disability.") (citation of authorities omitted). As outlined hereinabove, it is evident that the ALJ both adequately considered whether the plaintiff's combination impairments met a listing, and based his attendant combination of impairments finding on substantial evidence. For this reason also, the court is compelled to reject this claim of error.

### E.

As an additional assignment of error, the plaintiff argues that the ALJ failed *sua sponte* to seek "additional information" from Dr. Connell, if he found the doctor's office notes to be illegible. This contention too is without merit in this case. The fact that the ALJ gave little weight to the opinions of Dr. Connell does not create a duty to seek additional information in an

attempt to find his opinions to be credible. First, this argument by the plaintiff is based upon the Second Circuit decision in *Perez v. Chater*, 77 F.3$^d$ 41, 47 (2$^d$ Cir. 1996), and is not binding on this court. More importantly it is illogical, given the agency's requirement in 20 C.F.R. § 404.1527(d)(3) that the weight to be given a treating source opinion depends on the extent to which it is well-supported by clinical and laboratory findings in the record.

Even if it is assumed for the purpose of argument that the ALJ had some obligation to contact Dr. Connell before rejecting his opinions, the plaintiff has failed to make any showing of prejudice. *See Newton v. Apfel*, 209 F.3$^d$ 448, 458 (5th Cir. 2000) (holding that a plaintiff must demonstrate that additional evidence would have been produced by such a follow-up contact with a treating source and that it would have led to a different decision); *Ripley v. Chater*, 67 F.3$^d$ 552, 557 n.22 (5th Cir. 1995). In an apparent effort to demonstrate such prejudice, without objection the plaintiff submitted to this court typewritten copies of Dr. Connell's handwritten records which the ALJ had variously described as "partially illegible" or "even less legible" or "quite cryptic." (Docket #16, ex. A). On review, however, it is insufficient even to suggest prejudice. It is cumulative; it reaffirms the ALJ's assessment of the plaintiff's mental health care as "generally routine and conservative treatment; it reaffirms Dr. Connell's "minimal [level of] mental status examinations, and it reiterates his conclusory opinion that the plaintiff "has been unable to work since [he had] known her." In short, this evidence contains nothing new or material which would call into question the ALJ's assessment of Dr. Connell's disability endorsement, and it fails to demonstrate that, if considered by the ALJ, this evidence would have more fully developed the record and might have led to a different decision. *Ripley v. Chater*, 67 F.3$^d$ 552, 557 n22 (5th Cir. 1995) ("Prejudice can be established by showing that additional

17

evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision.") Having failed to make such a showing, any assumed error by the ALJ in failing to fulfill such an assumed duty was at most harmless. *See Camp v. Massanari*, 22 Fed. Appx. 311(4th Cir. 2001) (*per curium*).

VI. **Proposed Findings of Fact**

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1. All facets of the Commissioner's final decision are supported by substantial evidence;

2. The objective medical evidence during the decisionally relevant period (July 24, 2008 through December 31, 2009) neither shows that the plaintiff's alleged impairments significantly worsened nor that the evidence considered for the prior denial of her claim differed significantly from the evidence considered in her current claim;

3. Substantial evidence supports the finding that the plaintiff's condition neither met nor medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appx. 1, during the decisionally relevant period;

4. The ALJ did not err in his review of the plaintiff's physical impairments and associated functional limitations;

5. The ALJ did not err in his review of the plaintiff's mental health impairments and associated functional limitations;

6. The ALJ's "rejection" of the disability endorsement of Dr. Connell is reasonable and is supported by substantial evidence;

7. The ALJ's "finding[s of] little merit" in the separate disability endorsements of Drs. Vigil and Shafqat are reasonable and each is supported by substantial evidence;

8. The ALJ committed no error in his reliance on the results of examinations and the related opinions of consulting examiners;

9. Substantial evidence supports the ALJ's finding that through her date last insured the plaintiff retained the functional ability to perform a range of work at a light exertional level;

10. The plaintiff has failed to establish that her combination of impairments meets or medically equals listing 12.04;

11. The ALJ did not err by failing *sua sponte* to seek "additional information" from Dr. Connell;

12. The plaintiff failed to demonstrate that the additional evidence she submitted to the court or any additional evidence that might have been produced by ALJ follow-up contact with Dr. Connell might have led to a different decision by the ALJ;

13. The ALJ fulfilled his basic obligation to develop a full, fair and adequate record;

14. The plaintiff has not met her burden of proving her disability during the decisionally relevant period; and

15. The final decision of the Commissioner should be affirmed;

## VII. Directions to Clerk

The clerk is directed to transmit the record in this case immediately to the presiding district judge and to transmit a copy of this Report and Recommendation to all counsel of record.

## VIII. Notice to the Parties

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the

conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

**DATED:** This 9th day of July 2013.

*/s/ James G. Welsh*
United States Magistrate Judge